√G/B/E
ORIGINAL

U.S. DISTRICT
NORTHERN DISTRICT TEXAS

**FILED**

SEP - 6 2005

**CLERK, U.S. DISTRICT COURT**
By _____
Deputy

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**(DALLAS DIVISION)**

| | |
|---|---|
| FLAHERTY & CRUMRINE PREFERRED INCOME FUND INCORPORATED; FLAHERTY & CRUMRINE PREFERRED INCOME OPPORTUNITY FUND INCORPORATED; and FLAHERTY & CRUMRINE/CLAYMORE PREFERRED SECURITIES INCOME FUND INCORPORATED, | ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| TXU CORP.; and C. JOHN WILDER, | ) ) |
| Defendants. | ) ) ) |

No. **3-05CV1784-G**

~~222775~~ 

**COMPLAINT--CLASS ACTION**

**JURY TRIAL DEMANDED**

PLAINTIFFS' ORIGINAL CLASS ACTION COMPLAINT

Plaintiffs for their complaint allege:

NATURE OF THIS ACTION

1.      Defendant TXU Corp. ("TXU") in September 2004 made a self-tender offer

to purchase certain of its convertible securities at a price linked to the value of its

common stock, without disclosing its plan to dramatically increase the common stock's

dividend payout immediately following completion of the tender offer. Nine short days

after the tender offer expired, TXU adopted a 350% increase in its common stock

dividend, resulting in a 20% increase in the common stock price. To keep the common

231397_1.DOC/1512.01/dwd                        1

stock price low during the tender offer pricing period, however, TXU injected a false air of uncertainty into the market concerning its plan to increase the dividend, which enabled it to purchase the convertible securities from Plaintiffs and other class members at a substantial and artificial discount.    TXU's conduct violated federal securities law governing self-tender offers and market manipulation, as well as common law fiduciary duties.

## THE PARTIES

2.      Plaintiffs Flaherty & Crumrine Preferred Income Opportunity Fund Incorporated, Flaherty & Crumrine Preferred Income Fund Incorporated, and Flaherty & Crumrine/Claymore Preferred Securities Income Fund Incorporated (collectively, "Plaintiffs") are each a closed-end management investment company registered under the Investment Company Act of 1940, as amended, the common stock of which trade on the New York Stock Exchange.   Each is advised by Flaherty & Crumrine Incorporated, of Pasadena, CA.

3.      Defendant TXU is a Texas corporation, with its principal executive offices located at Energy Plaza, 1601 Bryan Street, Dallas, Texas, 75201-3411.

4.      Defendant C. John Wilder ("Wilder") was, at all times material to this action, the president and chief executive of TXU.

2

**JURISDICTION AND VENUE**

5.  The claims asserted herein arise under and pursuant to Sections 14(e), 10(b) and

20(a) of the Exchange Act, (15 U.S.C. §§ 78n(e), 78j(b) and 78t(a)), and Rule 10b-5

promulgated thereunder (17 C.F.R. § 240.10b-5), and common law.

6.  This Court has jurisdiction over the subject matter of this action pursuant to

Section 27 of the Exchange Act (15 U.S.C. § 78aa), 28 U.S.C. § 1331, 28 U.S.C. §1332,

and 28 U.S.C. § 1367.

7.  Venue is proper in this Judicial District pursuant to Section 27 of the Exchange

Act, (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Many of the acts and transactions

alleged herein, including the preparation and dissemination of materially false and

misleading information, occurred in substantial part in this District.

8.  In connection with the acts, conduct and other wrongs alleged in this complaint,

Defendants, directly or indirectly, used the means and instrumentalities of interstate

commerce, including but not limited to, the United States mails, interstate telephone

communications and the facilities of the national securities exchange.

**GENERAL ALLEGATIONS**

9.  TXU is a Dallas-based energy company that manages a portfolio of competitive

and regulated energy businesses, primarily in Texas.

10.  As of September 15, 2004, TXU had issued and outstanding approximately 11

million shares of convertible securities known as TXU Corp., 8.75% Series C ("the

Corporate Units").

11.     The Corporate Units are so-called mandatory convertible securities:  one half of the Corporate Units were slated for conversion to TXU common stock on November 16, 2004, and the remaining half were slated for conversion on November 16, 2005.

12.     As of September 15, 2004, TXU had issued and outstanding approximately 8.7 million shares of Income PRIDES ("the PRIDES").  The PRIDES are also so-called mandatory convertible securities and were slated for conversion to TXU common stock on May 16, 2006.

13.     The Corporate Units and the PRIDES are hereinafter referred to collectively as ("the Securities").

14.     There is a secondary market for the Securities.  Because of the convertible nature of the Securities, their market price highly correlates to the market price of TXU common stock.

15.     As of September 15, 2004, the Plaintiffs held 425,000 Corporate Units, CUSIP No. 873168504.

**WILDER'S RETENTION AND THREE PHASE RESTRUCTURING PROGRAM**

16.     TXU entered into an employment agreement with Wilder effective February 23, 2004. The agreement provides for Wilder's service as TXU's President and Chief Executive during a five-year term.  TXU agreed to use its best efforts to cause Wilder to be elected as Chairman of the Board effective with TXU's 2005 annual shareholders' meeting.  The agreement further provides that Wilder is entitled to a minimum annual base salary of $1,250,000; target annual bonuses under the TXU Annual Incentive Plan of 200% of such base salary (except that Wilder

was guaranteed receipt of the full 200% bonus in 2004); two initial awards of performance-based restricted stock awards of 150,000 shares each, one with a two-year performance period and the other with a three-year performance period; and annual performance-based restricted stock awards of 150,000 shares thereafter. Additionally, as provided for in the agreement, TXU has established a trust, which holds 500,000 shares of TXU common stock (Trust Shares) purchased by TXU, which Trust Shares are to be distributed to Wilder in the form of common stock, in equal portions on the third and sixth anniversaries of the agreement unless otherwise deferred. Under the agreement, Wilder also received a signing bonus of $1,000,000, and was given certain fringe benefits, including use of TXU's aircraft, reimbursement for temporary living expenses, and relocation benefits, as well as tax reimbursement payments related to the fringe benefits. Finally, under the agreement TXU also awarded Wilder 1,000,000 phantom units of TXU common stock should certain common stock target prices be met and sustained. These phantom shares vested during June 3-7, 2004.

17.     During Wilder's first year as TXU's CEO, including the Tender Period, he received nearly $55 million in total compensation.

18.     Wilder developed a "Three Phase Restructuring Program" for TXU. Details of Wilder's "Three Phase Restructuring Program" were withheld from the public, but TXU later admitted that one objective of the "Three Phase Restructuring Program" had been to remove "complicated securities" like the Securities from TXU's balance sheet, and thus "avoid[] the issuance of as many as 36 million additional shares of TXU Corp. common stock."

## TXU STATED DIVIDEND POLICY

19.     One of the most significant factors in the market price of utility stocks is the company's dividend rate.  When Wilder was hired in 2004, TXU had since October 2002 paid an annual dividend on its common stock of $0.50 per share.

20.     On May 18, 2004, TXU issued a Press Release, a true and accurate copy of which is attached as Exhibit A.  In the press release, TXU described the status of the TXU common stock dividend as follows:

> Upon reaching the targeted balance sheet strength and financial flexibility, management would recommend that the Board of Directors reevaluate the current dividend policy. At that time, management expects it would recommend targeting annual common stock dividends equal to a pay out of 100 percent of the earnings of TXU's electric delivery business. Of the free cash flow, management would expect to return roughly 80 percent to shareholders in the form of distributions or repurchases and to retain roughly 20 percent for long term growth initiatives.  Assuming the execution of the business initiatives and transactions described above, and depending on market trends in commodity prices, ***management expects that this capital allocation program will enable management to recommend an increase of the dividend in 2006.***  In addition to management's recommendation, the Board of Directors may consider other relevant factors in determining if and when to make a change in the dividend policy.

Exhibit A, at 5 (emphasis added).  This discussion was followed by Table 3, which illustrated "current expectations of sources and uses of cash for 2004 and 2005," and which showed ***no change*** in dividend pay-out rate for 2004 or 2005.  *Id.*

6

21.     However, in a letter dated January 18, 2005, a true and accurate copy of which is attached hereto as Exhibit B (hereinafter "the Poole letter"), TXU Senior Vice President and Associate General Counsel David P. Poole admits that TXU management in August 2004 privately "indicated to the [TXU] Board that, while [its] financial plan at that time did not contemplate a change in the dividend policy for at least 18 months, management was planning to undertake an evaluation of the current dividend in light of current business and market conditions." Poole letter, page 1. TXU management scheduled a Board meeting in October 2004 to address the dividend. Poole letter, page 2.

22.     The Poole letter further reveals that in August 2004 TXU management also began undisclosed discussions with an unidentified financial advisor concerning TXU's common stock dividend. Poole letter, page 1-2.

23.     In late August 2004, TXU's stock price began to rise relative to the Philadelphia Utility Index, as reflected in the chart attached as Exhibit C.

24.     On September 14, 2004, TXU common stock closed at $44.68 per share, the Corporate Unit at $50.38 per Unit, and the PRIDES at $48.00 per PRIDES.

## THE TENDER OFFER FOR THE CORPORATE UNITS

25.     On September 15, 2004 TXU announced an issuer tender offer for up to 11,433,285 outstanding Corporate Units and up to 8,700,000 outstanding PRIDES ("the Tender Offer"). TXU filed a Form 8K with the SEC concerning the Tender Offer, a true and accurate copy of which is attached as Exhibit D.

231397_1.DOC/1512 01/dwd                    7

26.     The Offering Documents relating to the Tender Offer included:

        a.     Press Release (copy attached as Exhibit E);

        b.     SEC Schedule TO (copy attached as Exhibit F);

        c.     "Offer to Purchase" (copy attached as Exhibit G).

27.     The dealer-managers for the Tender Offer were Bank of America Securities, LLC, Merrill Lynch & Co., Goldman, Sachs & Co., and UBS Securities, LLC (collectively, "the Dealer-Managers").

28.     The Information Agent for the Tender Offer was D. F. King & Co., Inc.

29.     The offering price for the Corporate Units in the Tender Offer was to be determined by applying a factor to the 20-day weighted average price of TXU common stock between September 20, 2004 and October 8, 2004, with minimum of $45.97 and maximum of $52.28 per Corporate Unit. Similarly, the offering price for the PRIDES in the Tender Offer was to be determined by applying a factor to the 20-day weighted average price of TXU common stock between September 20, 2004 and October 8, 2004, with a minimum price of $46.43 and a maximum price of $52.50 per PRIDES.

30.     The Pricing Date for the Tender Offer was set for October 8, 2004, and the offering price for the Securities to be announced on October 12, 2004.

31.     The Tender Offer was set to expire on October 13, 2004.

32.     TXU contends that it wanted to avoid "suggesting that a dividend increase was imminent, if there was a possibility that management would not recommend such an

increase to the Board or that the Board would ultimately not approve such an increase." Poole letter, page 1. Therefore, TXU's dividend policy was addressed in carefully worded, identical language in the Form 8K, the Press Release and the Offer to Purchase (hereinafter, "the Dividend Statement"):

> TXU Corp.'s debt and capital management program is intended to strengthen TXU Corp.'s balance sheet and financial flexibility. As a part of its capital management and restructuring program and considering current business and market conditions, TXU Corp.'s management is evaluating whether it should recommend to the TXU Corp. Board of Directors that they reevaluate TXU Corp.'s current common stock dividend policy. ***TXU Corp. cannot predict the outcome of management's evaluation, when, if at all, management would make a recommendation to the Board of Directors to change the current common stock dividend policy, or what management's recommendation might be.*** In addition to any recommendation from management, the Board of Directors may consider other relevant factors in determining if and when to make a change in TXU Corp.'s common stock dividend policy.

Exhibit D, at 3; Exhibit E, at 2; Exhibit G, at 28.

33. According to the Poole letter, however, at time of the launch of the Tender Offer, TXU management had in fact already undertaken preliminary market and financial analysis regarding dividend policy. Poole letter, page 2.

34. The Dividend Statement was never altered or modified at any time during the Tender Offer.

35. TXU in the Poole letter contends that the decision not to alter or modify the Dividend Statement was made by TXU after consultation with its legal counsel and the

Dealer-Managers. Poole letter, page 2.

## EVENTS DURING TENDER OFFER PRICING PERIOD

36.    During September 2004, TXU worked with a "financial advisor" regarding a potential change to the dividend payout. Poole letter, page 2. TXU also retained Moody's and S&P to advise TXU concerning the impact of a dividend increase on TXU's credit ratings. Poole letter, at page 3.

37.    On September 20, 2004, the beginning of the Pricing Period, TXU Common Stock closed at $46.47, the Corporate Units closed at $51.50 and the PRIDES closed at $50.89.

38.    On September 28, 2004, Wilder gave a presentation at the Merrill Lynch "Global Power & Gas Leaders Conference," which included a slide describing TXU's "Dividend Payout" as "Under review." A true and accurate copy of Wilder's slide presentation is attached as Exhibit H. On September 28, 2004, Wilder's slide presentation was incorporated into a Form 8-K filed with the SEC, as true and accurate copy of which is attached as Exhibit I.

39.    As of Friday, October 8, 2004, the end of the Pricing Period, TXU Common Stock closed at $48.95, the Corporate Units closed at $52.20 and the PRIDES closed at $52.25.

40.    On Monday, October 11, 2004, TXU issued a press release stating the offering price for each Corporate Unit had been fixed at $52.28 and for each PRIDE had been

fixed at $52.39, both based upon a $47.89 weighted average price of TXU's common stock during the Pricing Period. A true and accurate copy of this press release is attached as Exhibit J.

41.    On Tuesday, October 12 TXU management gave "a detailed financial plan" to Standard & Poor's ("S&P") and Moody's Investor Services ("Moody's"). Poole letter, page 3.

42.    On Wednesday, October 13 Plaintiffs tendered their 425,000 Corporate Units to TXU at the $52.28 Tender Offer price.

43.    On Wednesday, October 13 the Tender Offer expired. TXU common stock closed that day at $49.05 per share, the Corporate Units closed at $51.46 per unit and the PRIDES closed at $50.33.

## POST-TENDER OFFER EVENTS

44.    On Thursday, October 14 TXU issued a press release announcing the results of Tender Offer:   7,449,792 Corporate Units (64.6% of outstanding) were tendered, at $52.28 per Corporate Unit; 5,077,362 PRIDES (57.7%) were tendered, at $52.39 per PRIDES. A true and accurate copy of this press release is attached at Exhibit K.

45.    On Tuesday, October 19 TXU management provided materials to the TXU Board proposing a change in dividend policy. Poole letter, page 3.

46.    On Tuesday and Wednesday, October 19 and 20, TXU reportedly received reports from Moody's and S&P that the proposed increase in the dividend would not result in

any adverse action by them with respect to TXU's credit ratings.  Poole letter, page 3.

47.     At a Board meeting on Thursday, October 21 TXU management recommended an increase in the annual dividend on common stock to $2.25 (a 350% increase) and a buy-back of 50 million shares of common stock.  Poole letter, page 3.

48.     The morning of the next day, Friday, October 22 the TXU Board approved the dividend increase and the stock repurchase.  Poole letter, page 3.

49.     After the markets closed on Friday, October 22, TXU filed a Form 8K with the SEC, reporting the dividend increase and disclosing that TXU had "reviewed...its revised dividend and cash policies with Fitch Investors Service, Moody's Investor Services and Standard Poor's," and that "[a]ll three agencies have indicated to [TXU] that they will not be taking any ratings action."  A true and accurate copy of the Form 8K is attached as Exhibit L.

50.     On Monday, October 25 TXU issued a press release announcing its "revised dividend and cash distribution policy," increasing the annual dividend from $0.50 to $2.25 and revealing the decision to buy back approximately 50 million shares of TXU common stock.  A true and accurate copy of this press release is attached as Exhibit M.

51.     Upon the announced dividend increase, TXU common stock on October 25 jumped nearly 20%, from $52.81 to close at $61.25 per share (including record intra-day high of $62.40); Corporate Units similarly jumped nearly 10%, from $53.35 to close at $57.46 per Unit, and PRIDES likewise jumped from $53.25 to close at $55.40 per

PRIDES. The increase in market price occurred on the same day as the dividend increase was announced.

52. On November 16, 2004, one half of the untendered Corporate Units were converted to common stock trading at $66.05.

53. On November 22, 2004, TXU effectuated its stock repurchase through an agreement with Citibank to buy 52.5 million common stock shares at $64.57 per share by close of business November 26, 2004.

54. On November 29, 2004, TXU issued a press release proclaiming completion of Phase One of Wilder's "Three Phase Restructuring Program," which included the repurchase of the majority of the Securities, thereby "substantially removing these complicated securities from our balance sheet and avoiding the issuance of as many as 36 million additional shares of TXU Corp. common stock." A true and accurate copy of this press release is attached as Exhibit N.

## SCIENTER ALLEGATIONS

55. TXU and Wilder deliberately concealed their plan to increase the common stock dividend so as to induce Plaintiffs and the other holders of the Securities to sell them at the Tender Offer price, thereby removing them more cheaply than in mandatory conversion scheduled for November 16, 2004 and reducing TXU's common stock conversion (and dilution) risk. In addition, Defendants were aware that by maximizing the number of the Securities tendered, and by obtaining such tender at the lowest possible

price, earnings per share of TXU common stock would be positively affected for the immediate quarter and quarters thereafter.

56.     Contrary to the Dividend Statement, TXU and Wilder were in fact during the Tender Offer, in a position to disclose more truthfully "when, if at all" TXU Management would make a recommendation to increase the common stock dividend. TXU and Wilder made and left uncorrected the Dividend Statement in order to inject into the market a false sense of uncertainty about TXU and Wilder's planned increase in the dividend payout. As shown in the Chart attached as Exhibit O, this tactic had the intended effect of artificially depressing the market price of TXU common stock until the Tender Offer was completed.

57.     TXU's increase in the common stock dividend was not dependent upon completion of the Tender Offer. TXU had ample cash to pay dividend increase without the need for the Tender Offer.

58.     A sophisticated, highly paid CEO such as Wilder knew or was reckless in not knowing that a 350% increase in the dividend paid for TXU stock was planned for management recommendation and Board approval only days after close of the Tender Offer, especially when that dividend increase is made pursuant of Wilder's own "Three Phase Restructuring Program." TXU and Wilder knew that the Dividend Statement in the Offering Documents was materially false and misleading; knew that the Dividend Statement would be disseminated to the holders of the Securities; and knowingly and substantially

14

participated or acquiesced in the issuance and dissemination the Dividend Statement as a primary violation of the federal securities laws.

59.     Defendants knew and/or recklessly disregarded the falsity and misleading nature of their illegal conduct. The fraudulent actions described in this Complaint could not have been perpetrated throughout the Tender Period without the knowledge and complicity of the personnel at the highest level of TXU management, including Wilder, who personally perpetuated the false sense of uncertainty with his presentation of September 28, 2004 and signing of the related Form 8K.

### CLASS ACTION ALLEGATIONS

60.     This is a Class Action brought by the Plaintiffs on behalf of themselves and a Class consisting of all persons who sold the Securities to TXU in the Tender Offer, seeking to recover damages caused by Defendants' violations the Securities Exchange Act of 1934 (the "Exchange Act") and common law fiduciary duties. Excluded from the Class are Wilder and TXU.

61.     The Class consists of hundreds or thousands of sellers of the Securities. The identities and addresses of Class members can be readily ascertained from business records maintained by TXU.

62.     The claims asserted by Plaintiffs are typical of the claims of the Class.

63.     Plaintiffs will fairly and adequately protect the interests of the Class in that they have no interest antagonistic to those of the other Class members, and Plaintiffs have

retained, as Class Counsel, attorneys who are knowledgeable and experienced in securities matters, as well as class and complex litigation.

64.     Plaintiffs request that the Court afford Class members with notice and the right to opt-out of any Class certified in this action.

65.     This action is appropriate as a class action pursuant to Rule 23 (b)(3) of the Federal Rules of Civil Procedure.

66.     The questions of law or fact affecting the Class predominate over those questions affecting only individual members.  Those common questions include:

     a.    whether the Dividend Statement was untrue and misleading when made;

     b.    whether the Dividend Statement was untrue and misleading throughout the Tender Offer;

     c.    whether Defendants knew that the Dividend Statement was untrue and misleading when made and throughout the Tender Offer;

     d.    whether Wilder's representation during the Tender Offer was untrue and misleading;

     e.    whether Defendants' actions violated Section 14(e) of the Exchange Act and Rule 10b-5 promulgated thereunder;

     f.    whether Defendants' actions violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder;

g.    whether Wilder has controlling person liability under Section 20(a) of the Exchange Act;

h.    whether Defendants breached fiduciary obligations owed to Plaintiffs and members of the Class;

i.    whether Plaintiffs and the members of the Class are entitled to compensatory damages;

j.    what is the proper measure of damages recoverable by Plaintiffs and the members of the Class;

k.    whether Plaintiffs and members of the Class are entitled to an award of punitive damages; and

l.    whether Plaintiffs and the members of the Class are entitled to such other relief as the Court may deem just and proper.

67.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

a.    given the expense of litigating the claims alleged herein, few, if any, Class members could obtain cost-effective relief on an individual basis for the wrongs that Defendants committed against them, and absent Class members have no substantial interest in individually controlling the prosecution of individual actions;

b.    when Defendants' liability has been adjudicated, claims of all Class

members can be determined by the Court;

c.     this action will cause an orderly and expeditious administration of the Class claims and foster economies of time, effort and expense, and ensure uniformity of decisions;

d.     without a class action, Defendants' violations of law will remain unaddressed, allowing Defendants to reap and retain the substantial proceeds of their wrongful conduct; and

e.     this action does not present any undue difficulties that would impede its management by the Court as a class action.

## FIRST CAUSE OF ACTION

(Section 14(e) of the Exchange Act)

68.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

69.    The actions of TXU and Wilder violated Section 14(e) of the Securities Exchange Act as supplemented by the Williams Act of 1968. Section 14(e) makes it unlawful:

> for any such person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition or in favor of any such offer, request, or invitation.

15 U.S.C. § 78n(e) (2000).

18

70.    The Supreme Court, in *Piper v. Chris-Craft Indust., Inc.,* 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977), held that a private right of action was implied for the class of securities holders whose securities are sought in a tender offer.

71.    The *Piper* Court concluded that "the sole purpose of the Williams Act was the protection of investors who are confronted with a tender offer." *Id.* at 35, 97 S.Ct. 926. It quoted with approval *Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 58, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975), which stated that "[t]he purpose of the Williams Act is to insure that public shareholders who are confronted by a cash tender offer for their stock will not be required to respond without adequate information." *Piper*, 430 U.S. at 35, 97 S.Ct. 926.

72.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their sales of the Securities to TXU in the Tender Offer.

## SECOND CAUSE OF ACTION

(Section 10(b) of the Exchange Act)

73.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

74.    During the Tender Offer the Defendants carried out a plan, scheme and course of conduct which was intended to and did distort the market price of TXU common stock so as to deceive the holders of the Securities including Plaintiffs and the other Class

members and cause Plaintiffs and other members of the Class to sell the Securities to TXU at distorted prices and otherwise suffer damages. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

75.     Defendants (i) employed devises, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and course of business which operated as a fraud and deceit upon the sellers of the Securities, including Plaintiffs and other members of the Class, in an effort to enrich themselves through manipulative tactics and otherwise distorted the pricing of TXU common stock and of the Securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued as primary participants in the wrongful and illegal conduct and scheme charged herein.

76.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal material information about the TXU common stock dividend, as specified herein.

77.     Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to

them. Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the truth.

78. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of TXU stock was distorted during the Tender Offer. In ignorance of these facts and relying directly or indirectly on the false and misleading statements made by the Defendants, or upon the integrity of the market in which TXU common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Tender Offer, Plaintiffs through their investment advisor sold their Securities in the Tender Offer and were damaged thereby.

79. At the time of said misrepresentations and omissions, Plaintiffs were ignorant of their falsity, and believed them to be true. Had Plaintiffs and their investment advisor known the truth concerning the TXU dividend increase, which was not disclosed by Defendants, they would not have sold their Securities in the Tender Offer.

80. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

### THIRD CAUSE OF ACTION

(Controlling Person Liability Against Wilder)

81. Plaintiffs repeat and reallege each and every allegation contained above as if fully

set forth herein.

82.     This Count is brought pursuant to Section 20(a) of the Exchange Act against Wilder as a control person of TXU.

83.     By virtue of his operational and management control of TXU's respective businesses and systematic involvement in the fraudulent scheme alleged herein, Wilder had the power to influence and control and did influence and control, directly or indirectly, the decision-making and actions of TXU, including the content and dissemination of the Dividend Statement which Plaintiffs contend was false and misleading.

84.     In particular, Wilder had direct and supervisory involvement in the operations of TXU and, therefore, is presumed to have had and did exercise the power to control or influence TXU's conduct in the Tender Offer so as to give rise to the securities violations as alleged herein.

85.     As set forth above, Wilder violated Section 14(e), Section 10(b) and Rule 10b-5 by his acts and omissions as alleged in this Complaint. By virtue of his positions as a controlling person, Wilder is also liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their sale of the Securities in the Tender Offer.

## FOURTH CAUSE OF ACTION

### (Breach of Fiduciary Duties)

86.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

87.     Defendants owed Plaintiffs and the Class fiduciary duties of loyalty and truthfulness.

88.     Defendants breached their fiduciary duties to the Plaintiffs and the Class by their actions alleged above in violation of the securities laws, by making and maintaining the Dividend Statement and by withholding material information concerning TXU's common stock dividend program and payout.

89.     Each of the Defendants actively participated in the breach of fiduciary duty for the purpose of advancing his or its own interests.

90.     Plaintiffs and the Class have been specially injured by Defendants' wrongdoing, through sale of their Securities in the Tender Offer for less than what they would have been entitled to receive had Defendants not engaged in their misconduct.

91.     Wilder furthermore aided and abetted TXU's breach of fiduciary duty, for personal gain and in furtherance of his own financial advantage, through his September 28, 2004 presentation.  Wilder as an aider and abettor is jointly and severally liable for an amount to be determined at trial.

92.     As a direct and proximate result of the Defendants' breaches of their fiduciary

duties, Plaintiffs and the members of the Class have suffered damages. An award of punitive damages is also warranted under state law, to deter such improper conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs on behalf of themselves and of the Class pray for relief and judgment, as follows:

(a)   Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the *Federal Rules of Civil Procedure* on behalf of the Class defined herein;

(b)   Awarding Plaintiffs and the other members of the Class compensatory and punitive damages in an amount which may be proven at trial, together with interest thereon;

(c)   Awarding Plaintiffs and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs;

(d)   Awarding such other and further relief as this Court may deem just and proper including any extraordinary equitable and/or injunctive relief as permitted by law or equity to attach, impound or otherwise restrict the Defendants' assets to assure Plaintiff and other members of the Class have an effective remedy; and

(e)   Awarding other and further relief as this Court deems appropriate.

24

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:  September 6, 2005.

**DODGE & GILLMAN, P.C.**

Michael C. Dodge (TBN 05937000)
David W. Dodge (TBN 24002000)
One Lincoln Centre, Suite 910
Dallas, Texas  75240
Phone:  (972) 960-3200
Fax:  (972) 960-3221

**SHOCKMAN LAW OFFICES, P.C.**
Rosemary J. Shockman
8170 N. 86th Place, Suite 102
Scottsdale, Arizona  85258-4308
Phone: (480) 596-1986
Facsimile:  (480) 596-2689

**BONNETT, FAIRBOURN, FRIEDMAN
  & BALINT, P.C.**
Andrew S. Friedman
Francis J. Balint, Jr.
2901 N. Central Avenue, Suite 1000
Phoenix, Arizona  85012
Phone:  (602) 274-1100
Fax:  (602) 274-1199

**ATTORNEYS FOR PLAINTIFFS**