UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION


FLAHERTY & CRUMRINE          )
PREFERRED INCOME FUND        )
INCORPORATED, ET AL.,        )
                             )          CIVIL ACTION NO.
          Plaintiffs,        )
                             )          3:05-CV-1784-G
VS.                          )
                             )          **ECF**
TXU CORP. and C. JOHN WILDER, )
                             )
          Defendants.        )


## MEMORANDUM OPINION AND ORDER

Before the court are the following motions: (1) the motion of the defendants,

TXU Corporation ("TXU")[1] and C. John Wilder ("Wilder") (collectively, "the

defendants"), to dismiss the plaintiffs' second amended class action complaint;

(2) the motion of the defendants to strike the report of Linda Allen; (3) the motion

of the plaintiffs, Flaherty & Crumrine Preferred Income Fund, Inc., Flaherty &

Crumrine Preferred Income Opportunity Fund, Inc., Flaherty & Crumrine/Claymore

Preferred Securities Income Fund, Inc., and Stan Haiduk (collectively, "the

---

[1]     TXU Corporation was purchased in September of 2007, and though the
company has since changed its name to Energy Future Holdings Corp., the court will
refer to the defendant corporation as "TXU" throughout.

plaintiffs"), for a hearing;[2] (4) the defendants' motion to dismiss count 4 of the plaintiffs' second amended class action complaint; and (5) the plaintiffs' motion to strike the defendants' motion to dismiss count 4 of the second amended complaint.

For the reasons discussed below, the motion of the defendants to dismiss the plaintiffs' second amended complaint is granted, the motion to strike the report of Linda Allen is denied, the motion for hearing is denied, the motion to dismiss count 4 of the plaintiffs' complaint is granted, and the plaintiffs' motion to strike is denied.

## I. BACKGROUND

The plaintiffs originally filed this suit on September 6, 2005. Plaintiffs' Original Class Action Complaint ("Original Complaint"); Docket Entry # 1. After the plaintiffs amended their complaint on November 28, 2005, the defendants filed their first motion to dismiss on December 16, 2005. *See* Docket Entry # 21. On August 30, 2006, this court granted the defendants' motion to dismiss, and the plaintiffs appealed to the Fifth Circuit Court of Appeals. *See* Docket Entry #33; Docket Entry # 35.

While the appeal was pending, the United States Supreme Court issued its decision in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, __ U.S. __, 127 S.Ct. 2499 (2007), which clarified the pleading standard for scienter under the Private Securities

---

[2] The plaintiffs seek a hearing on the defendants' motion to dismiss pursuant to local rule 7.1(g). *See* Docket Entry # 54. However, the court does not find that an evidentiary hearing would be helpful. Therefore, the motion for hearing is denied.

Litigation Reform Act ("PSLRA").  In response to the *Tellabs* decision, and without addressing the merits of the plaintiffs' appeal, the Fifth Circuit vacated[3] this court's judgment and remanded the case for further consideration in light of *Tellabs*.  See generally *Flaherty & Crumrine Preferred Income Fund Inc. v. TXU Corp.*, 242 Fed. Appx. 253 (5th Cir. 2007).

The plaintiffs then filed a second amended complaint on November 26, 2007, for the most part restating the same facts they initially alleged, though supplementing the complaint with the expert report of Linda Allen ("Allen report") and additional instances of alleged fraudulent misrepresentations.  *See generally* Plaintiffs' Second Amended Complaint ("Second Amended Complaint").  On December 14, 2007, the defendants filed a motion to dismiss, as well as a motion to strike the Allen report.  *See* Defendants' Motion to Dismiss Amended Complaint in Light of *Tellabs* and to Strike Report of Linda Allen and Brief in Support ("Motion to Dismiss").  Over a month later, on January 29, 2008, the defendants filed an additional motion to dismiss the plaintiffs' common law fraud claim.  *See* Defendants' Motion to Dismiss Count Four of Plaintiff's [sic] Amended Complaint (Common-Law Fraud) or for Judgment on the Pleadings and Brief in Support ("Second Motion to Dismiss").  Finally, the plaintiffs moved to strike the defendants' second motion to dismiss.  *See*

---

[3]        The plaintiffs erroneously stated in their response that the Fifth Circuit *reversed* this court's prior decision.  *See* Plaintiffs' Opposition to Defendants' Motion to Dismiss Second Amended Complaint at 2.

Plaintiffs' Amended Motion to Strike Defendants' Second Motion to Dismiss, and Alternative Motion for Enlargement of Time to Respond ("Plaintiffs' Motion to Strike").

In the second amended complaint, the plaintiffs once again allege three causes of action under the Securities Exchange Act: (1) violation of Section 14(e);[4] (2) violation of Section 10(b) and Rule 10b-5;[5] and (3) controlling person liability against Wilder, TXU's chief executive officer, under Section 20(a).[6] Second Amended Complaint ¶¶ 131-141. These are all claims of fraud. Additionally, and in

---

[4]    Section 14(e), as amended by the Williams Act of 1968, makes it unlawful for "any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation." Second Amended Complaint ¶ 132 (quoting 15 U.S.C. § 78n(e)).

[5]    Rule 10b-5, promulgated to facilitate the enforcement of Section 10(b), makes it illegal for any person "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading . . ." Second Amended Complaint ¶ 136 (quoting 17 C.F.R. § 240.10b-5).

[6]    A person who exerts control over a person who violates any provision of the Securities Exchange Act can be held jointly and severally liable with the primary violator. Second Amended Complaint ¶ 139; 15 U.S.C. § 78t(a). Controlling person liability under Section 20(a) requires an underlying violation by the controlled person; thus, if the case against the corporate defendant is dismissed, the case against Wilder must also be dismissed. *Southland Securities Corporation v. INSpire Insurance Solutions Inc.*, 365 F.3d 353, 383-84 (5th Cir. 2004); *In re Enron Corporation Securities, Derivative & "ERISA" Litigation*, 439 F. Supp. 2d 692, 695 (S.D. Tex. 2006).

the alternative, the plaintiffs have alleged a fourth cause of action for common law fraud. *Id.* ¶¶ 142-148.

Specifically, the plaintiffs allege that the defendants fraudulently misrepresented the temporal proximity and magnitude of a planned stock repurchase program and dividend increase to induce the plaintiffs to participate in a voluntary tender offer to purchase certain convertible securities.[7] *Id.* ¶ 1.

The concept and design of the tender offer emerged out of Wilder's "Three Phase Restructuring Program." *Id.* ¶ 35. The goal of the program was to strengthen TXU's balance sheet and increase the corporation's financial flexibility. *Id.* ¶ 38. One prong of the program called for the removal of the convertible securities from the market so as to allow TXU to avoid issuing approximately 36 million additional shares of common stock on the securities' conversion dates. *Id.*

On May 18, 2004, months before the tender offer, TXU issued a press release outlining its view of the company's financial restructuring program. *See* Press Release, *attached to* Second Amended Complaint *as* Exhibit E. TXU set forth certain financial benchmarks and stated that:

---

[7] Two types of convertible securities were involved in the underlying transaction: (1) corporate units, which were slated for conversion to common stock on November 16, 2004, and November 16, 2005, and (2) Income PRIDES, which were slated for conversion on May 16, 2006. Second Amended Complaint ¶¶ 23-25. Because both types of securities would eventually convert to common stock, their value on the secondary market was closely tied to the price of TXU's common stock. *Id.* ¶ 26.

> "[u]pon reaching the targeted balance sheet strength and financial flexibility, management would recommend that the Board of Directors reevaluate the current dividend policy. . . . Assuming the execution of the business initiatives and transactions described above, and depending on market trends in commodity prices, management expects that this capital allocation program will enable management to recommend an increase of the dividend in 2006. In addition to management's recommendation, the Board of Directors may consider other relevant factors in determining if and when to make a change in the dividend policy."

*Id.* at 111.

The press release indicated that TXU did not anticipate a dividend increase in 2004 or 2005, but noted that the Board might consider other relevant factors. *Id.* Not long after the May press release, TXU began discussions with a financial advisor concerning the common stock dividend and scheduled a board meeting for October 2004 to discuss the possibility of altering the dividend policy. *Id.* ¶ 48.

On September 15, 2004, TXU announced an issuer tender offer for up to 11,433,285 outstanding corporate units and 8,700,000 outstanding Income PRIDES. *Id.* ¶ 54. The corporation determined the offering price for each security by applying a factor to the 20-day weighted average price of TXU common stock between September 20, 2004 and October 8, 2004. *Id.* ¶ 56. This resulted in offering prices that were greater than the securities' market value. *Id.* ¶ 75. Those prices were announced on October 11, 2004, and the offer was set to expire on October 13, 2004. *Id.* ¶ 75; Press Release, *attached to* Second Amended Complaint *as* Exhibit L.

The offer itself (as well as forms filed with the SEC and the associated press release) contained the following language:

> As a part of its capital management and restructuring program and considering current business and market conditions, TXU Corp.'s management is evaluating whether it should recommend to the TXU Corp. Board of Directors that they reevaluate TXU Corp.'s current common stock dividend policy. *TXU Corp. cannot predict the outcome of management's evaluation, when, if at all, management would make a recommendation to the Board of Directors to change the current common stock dividend policy, or what management's recommendation might be.* In addition to any recommendation from management, the Board of Directors may consider other relevant factors in determining if and when to make a change in TXU Corp.'s common stock dividend policy.

*Id*. ¶ 59 (emphasis in original). The plaintiffs allege that this language is misleading because the defendants must have known at the time the statements were made that a dividend increase was imminent.[8] *Id.* Furthermore, the plaintiffs allege that the defendants intentionally released the misleading information into the market so as to suppress prices during the offering period, which allowed them to reduce their outstanding debt more cheaply than if the market had been aware of the "imminent" dividend increase. *Id*. ¶ 114.

---

[8] On September 28, 2004, Wilder gave a presentation (the "Wilder Representation") at a conference where he indicated that TXU's dividend policy was under review. *Id.* ¶¶ 66-67; Merrill Lynch Global Power & Gas Leaders Conference: TXU at 219, *attached to* Second Amended Complaint *as* Exhibit K. The plaintiffs allege that, like the language in the offer, Wilder's presentation understated and misrepresented the likelihood and scale of the dividend increase and stock repurchase. Second Amended Complaint ¶¶ 69-72.

On October 12, 2004, just one day before the expiration of the offer, TXU management gave a detailed financial plan to certain credit rating agencies for the purpose of facilitating the agencies' determinations of whether an increase in TXU's annual dividend would adversely affect the corporation's credit rating. *Id.* ¶ 76. The tender offer then closed on October 13, 2004, but not before the plaintiffs had tendered approximately 430,000 corporate units and 5,000 PRIDES at the proposed tender offer prices. *Id.* ¶¶ 77-79. However, approximately 35% of the tender offerees declined to participate in the offer. *See* Poole Letter, *attached to* Second Amended Complaint *as* Exhibit B, at 62.

TXU experienced a strong third quarter in 2004. *See generally* TXU's October 22, 2004 Form 8-K, *attached to* Motion to Dismiss *as* Exhibit 1. Additionally, TXU completed several significant corporate transactions during the period from May to October of 2004, including divestitures totaling $4.3 billion in cash proceeds. *Id.*; Allen Report, *attached to* Second Amended Complaint *as* Exhibit A, at 19-20. On October 19, 2004, TXU management provided materials to the Board of Directors proposing a change in dividend policy, and on October 21, 2004, management recommended a 350% increase of the annual dividend on common stock and a 400% increase in the stock repurchase program. Second Amended Complaint ¶¶ 81, 83. In the interim, between management's provision of the materials to the board and the final recommendation, TXU management received final reports from the credit rating

agencies informing the corporation that an increase in dividend payouts would not adversely affect its credit rating. *Id.* ¶ 82. Accordingly, on October 22, 2004, the board approved the dividend increase and the stock repurchase program. *Id.* ¶ 87.

On October 25, 2004, TXU publicly announced its plan to increase the common stock dividend from $0.50 to $2.25 and to repurchase approximately 50 million shares of TXU common stock. *Id.* ¶ 89. Immediately following the announcement, the per-share value of TXU common stock jumped nearly 20%. *Id.* ¶ 90. The corporate units and the PRIDES experienced a lesser but similar increase in value. *Id.* The plaintiffs allege that the defendants intentionally defrauded them and other similarly situated holders of TXU securities by failing to inform those who participated in the tender offer that a dividend increase and stock repurchase was imminent. *Id.* ¶¶ 70-72.

## II. ANALYSIS

### A. Motion to Dismiss

#### 1. *12(b)(6) Standard*

"To survive a Rule 12(b)(6) motion, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'" *In re Katrina Canal Breaches Litigation*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Bell Atlantic Corp. v. Twombly*, __ U.S. __, 127 S.Ct. 1955, 1974 (2007)). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's

obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic*, 127 S.Ct. at 1964-65 (citations, quotations marks, and brackets omitted). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Katrina Canal*, 495 F.3d at 205 (internal quotation marks omitted) (quoting *Bell Atlantic*, 127 S.Ct. at 1965). "The court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Id.* (internal quotation marks omitted) (quoting *Martin K. Eby Construction Company v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)).

To avoid dismissal, fraud claims under Section 10(b) and 14(e) of the Exchange Act must also satisfy the heightened pleading requirements imposed by Rule 9(b) of the Federal Rules of Civil Procedure. Rule 9(b) states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). The Fifth Circuit interprets Rule 9(b) strictly, requiring the plaintiff to "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Williams v. WMX Technologies, Inc.*, 112 F.3d 175, 177 (5th Cir.), *cert. denied*, 522 U.S. 966 (1997); *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 412 (5th Cir. 2001).

Additionally, beyond the requirements of Rule 9(b), the PSLRA requires that a plaintiff in a securities fraud case "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The recent Supreme Court case of *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, __ U.S. __, 127 S.Ct. 2499 (2007), articulated the proper pleading requirements for establishing a strong inference of scienter.[9] In *Tellabs*, the Supreme Court held that "[t]o qualify as 'strong' within the intendment of § 21D (b)(2), . . . an inference of scienter must be more than merely plausible or reasonable -- it must be cogent and at least as compelling as any opposing inference of non-fraudulent intent." *Id.* at 2504-05. The analysis is comparative in nature, and the court must consider "competing inferences rationally drawn from the facts alleged." *Id.* at 2504.

## 2. *The Plaintiffs' Claims under the Securities Exchange Act*

To state a section 10(b)/Rule 10b-5 claim, a plaintiff must allege, in connection with the purchase or sale of securities, (1) a misstatement or an omission (2) of a

---

[9] Scienter has been defined by the Supreme Court to be "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12 (1976). The Fifth Circuit has held that scienter can be shown by "either intent *or severe recklessness*." See *Financial Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 287 (5th Cir. 2006) (emphasis in original). Severe recklessness "is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, . . . present[ing] a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Central Laborers' Pension Fund v. Integrated Electrical Services Inc.*, 497 F.3d 546, 551 (5th Cir. 2007).

material fact (3) made with scienter (4) on which the plaintiff relied (5) that proximately caused the plaintiff injury. *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 430 (5th Cir. 2002); *R2 Investments LDC v. Phillips*, 401 F.3d 638, 641 (5th Cir. 2005). The elements of a section 14(e) claim are "identical" to the section 10(b)/Rule 10b-5 elements. *Smallwood v. Pearl Brewing Company*, 489 F.2d 579, 605 (5th Cir.), *cert. denied*, 419 U.S. 873 (1974). The aforementioned heightened pleading standards of Rule 9(b) and the PSLRA apply equally to both claims. See *Hollywood Casino Corporation v. Simmons*, No. 3:02-CV-0325-M, 2002 WL 1610598 at *2 (N.D. Tex. July 18, 2002). Accordingly, the court will address both claims simultaneously.

In their second amended complaint, the plaintiffs allege a total of six specific instances where the defendants either affirmatively misrepresented the status of the dividend increase and repurchase program or made material omissions pertinent thereto.[10] The second amended complaint adequately specifies with particularity which statements contain the alleged misrepresentation and omissions, when and where those statements were made, and why the plaintiffs believe them to be misleading. *See* Second Amended Complaint ¶¶ 35-73. Furthermore, the plaintiffs

---

[10]     These misrepresentations and omissions are denominated in the second amended complaint as "The Dividend Policy Statement," the "Stock Repurchase Statement," the "Dividend Omission," the "Buyback Omission," the "Dividend Representation" and/or the "Wilder Representation." Second Amended Complaint ¶¶ 133, 137.

have adequately demonstrated that the alleged misstatements and omissions were material to the plaintiffs' decision to participate in the tender offer. Second Amended Complaint ¶¶ 60-63.

Additionally, the plaintiffs have offered the expert report of professor Linda Allen. The defendants have moved to strike the report on the basis that it is "insufficient" under the standard set forth in *Financial Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 285-86 (5th Cir. 2006), which held that "opinions cannot substitute for facts under the PSLRA." *See* Motion to Dismiss at 16. The court need not address the motion to strike, however, because the content of the Allen report does not affect the ultimate disposition of the case, and as a result the defendants' motion to strike is denied as moot.[11]

The only real issue, once again, is whether the plaintiffs have "state[d] with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The court now turns to the six specific misrepresentations/omissions alleged by the plaintiffs to determine if TXU acted with the requisite scienter. Each specific misrepresentation/omission will be addressed, with the court considering, as *Tellabs* requires, opposing inferences of non-fraudulent intent. The court will then examine whether the entire quantum of facts

---

[11] The plaintiffs contend that the Allen report buttresses the argument that the defendants acted with scienter. After reviewing the report, however, the court finds that professor Allen's assessment of the facts does little to establish a strong inference of scienter.

establishes scienter.  See *Central Laborers'*, 497 F.3d at 555 (examining the "collective impact" of the plaintiffs' allegations); *Abrams*, 292 F.3d at 431 (recognizing that *Zonagen* suggests all allegations should be read together to make a determination of scienter).

## a. The Dividend Policy Statement

The plaintiffs claim that TXU made two misrepresentations in the May 2004 press release by stating that any increase in the TXU common dividend would likely occur in 2006 after certain financial benchmarks had been met.  *See* Second Amended Complaint ¶ 45; Press Release, *attached to* Second Amended Complaint *as* Exhibit E. The plaintiffs claim that the truthfulness of TXU's press release changed significantly throughout the tender offer period, and that TXU failed to disclose the changes to the interested parties, thus demonstrating scienter.  However, cautionary language in the May press release that the Board "may consider other relevant factors" when reaching a decision on the dividend policy weighs against a finding of scienter.  Though the plaintiffs urge that "[n]o reasonable investor would disregard" the bulk of the May press release, *see* Plaintiffs' Opposition to Defendants' Motion to Dismiss Second Amended Complaint ("Plaintiffs' Response") at 13, the court notes that nearly 35% of the potential class *did* pass on the tender offer.  Poole Letter, *attached to* Second Amended Complaint *as* Exhibit B, at 62.

b.  <u>The Stock Repurchase Statement</u>

The plaintiffs argue that TXU's failure to follow the announced plan to repurchase "up to 10 million share of its common stock" demonstrates scienter. Second Amended Complaint ¶ 50; TXU's Form 8-K, *attached to* Second Amended Complaint *as* Exhibit F, at 120.  Ultimately, management recommended the repurchase of nearly 50 million shares of TXU stock.  *See* Second Amended Complaint ¶ 83.  The plaintiffs claim they relied on the estimate of 10 million shares when deciding whether to sell their securities, *id*. ¶¶ 50-52, but it is unclear to the court how the disparity between 10 and 50 million shares supports a strong inference of scienter.  The critical factor would appear to be the amount of the dividend, not the number of shares TXU ultimately decided to repurchase.

c.  <u>The Dividend Representation and Wilder Representation</u>

The plaintiffs argue that the "Dividend Representation" and the "Wilder Representation" also show scienter on the part of TXU.  *See* Second Amended Complaint ¶¶ 59-60.  The plaintiffs contend that when TXU made the tender offer, TXU was "in a position to know when it would recommend a change in [the] dividend policy to the Board."  *Id.* ¶ 59.  Therefore, Flaherty & Crumrine asserts, because TXU did not correct or retract the May 2004 "Dividend Policy Statement," the representations it made during the tender offer demonstrate TXU's intent to deceive the plaintiffs.  Plaintiffs' Response at 8-10.

During the tender offer, TXU disclosed that the dividend policy was under review, stating specifically that it "cannot predict the outcome of management's evaluation, when, if at all management would make a recommendation to the Board of Directors to change the current common stock dividend policy, or what management's recommendation might be." Second Amended Complaint ¶ 59; Motion to Dismiss at 7. The plaintiffs ignored the writing on the wall. The mere fact that a board meeting had been scheduled to discuss the dividend policy did not make the increase "imminent" -- TXU still needed to obtain information from the credit agencies, and the board still needed to consider that information and make a decision.

The "Wilder Representation" also fails to support a strong inference of scienter. The presentation,[12] which Wilder gave on September 28, 2004, outlines TXU's financial restructuring program, and, consistent with TXU's previous disclosures, notes that TXU's dividend policy was under review. The fact that Wilder gave a presentation on the 3-phase restructuring program does not provide a strong inference of scienter. Though ultimately the dividend was increased in advance of the program's projection, TXU was not bound to the benchmarks alone. As detailed above, other factors were relevant to the board's decision, and Wilder was not in a position in September of 2004 to speculate as to what that decision might be.

---

[12]     *See* Merrill Lynch Global Power & Gas Leaders Conference:  TXU, *attached to* Second Amended Complaint *as* Exhibit K.

### d.  The Dividend Omission and Buyback Omission

The "Buyback" and "Dividend" omissions, as alleged by the plaintiffs, stem from the lack of information in the tender offering documents about the "imminent and dramatic increase" in TXU's common stock dividend and the common stock buyback program.  Second Amended Complaint ¶ 62.  The court finds little difference between the "dividend representation" and the two omissions urged by the plaintiffs.  Flaherty & Crumrine's insistence that a dividend increase was imminent does not make that the case.  For the same reasons articulated in Part II(A)(2)(c), the court finds that the omissions highlighted by the plaintiffs do not established a strong inference of scienter.

### e.  The Quantum of Facts

The plaintiffs' assertions rest solely on circumstantial evidence -- they have no smoking gun to support their allegations; rather, their argument is based on a series of inferences.  As proof of the defendants' knowledge that a dividend increase was a foregone conclusion prior to the termination of the tender offer, the plaintiffs proffer the following facts to supplement the specific instances discussed above:  (1) TXU (and Wilder specifically) developed the three-stage restructuring plan and stood to benefit financially from a dividend increase; (2) TXU retained a financial advisor; (3) TXU notified the Board of Directors in August of 2004 that a meeting was set for October to discuss the dividend policy; and (4) TXU submitted a detailed financial

plan to credit rating agencies to support the dividend increase.  Plaintiffs' Response at 11-15.

However, when considering, as *Tellabs* requires, opposing inferences of non-fraudulent intent, the court finds that the plaintiffs have failed to establish a strong inference of scienter.  Looking at the contested disclosures from the defendants' perspective, there is ample evidence to support non-fraudulent intent.  It appears that the plaintiffs expected TXU to state unequivocally that a dividend increase was on the way.  Even if TXU had explicitly stated that the May benchmarks were no longer critical, and if the plaintiffs had declined the tender offer, the court could imagine a suit by the plaintiffs complaining that TXU misled them into *not* participating in the tender offer had a dividend increase not been approved by the board.

The plaintiffs focus on the defendants' failure to "retract" the May benchmarks as evidence of scienter.  Plaintiffs' Response at 10.  However, TXU's disclosures make it clear that the benchmarks were not the only factor that would be considered.  The May press release states that "[i]n addition to the management's recommendation, the Board . . . may consider other relevant factors in determining if and when to make a change in the dividend policy."  *See* Second Amended Complaint ¶ 45.

Furthermore, Wilder's compensation and involvement in the restructuring plan does not weigh for or against a strong inference of scienter.  CEOs are expected to develop strategies to improve a company's financial situation, and in exchange for

getting results, CEOs expect to be compensated.  For any inference of scienter one could draw from Wilder's role in TXU's success, there exists an equally plausible, non-fraudulent inference.

Though the plaintiffs have increased the number of alleged misrepresentations and omissions they attribute to TXU, there is hardly more substance to their current claims than in the initial complaint.  There is a fine (but important) distinction between *planning* for a *possible* dividend increase and *concealing* an *imminent* dividend increase.

To further illustrate the plaintiffs' failure to adequately allege a strong inference of scienter, the court looks to Fifth Circuit PSLRA precedent.  The Fifth Circuit addressed the *Tellabs* standard for scienter in *Central Laborers' Pension Fund v. Integrated Electrical Services, Inc.*, 497 F.3d 546 (5th Cir. 2007).  In holding that a securities fraud complaint failed to plead scienter with sufficient particularity, the court "examine[d] the[] allegations *in toto* when determining whether [the plaintiff] adequately pleaded scienter." *Id.* at 552.  The plaintiff alleged "insider trading, GAAP violations, failure to fix an accounting error, the making of false statements about internal controls, and pervasive knowledge of accounting problems" throughout the defendant corporation.  *Id.*  Even after considering the plaintiff's numerous allegations, the court did not find a strong inference of scienter.  *Id.* at 555.  The

allegations in *Central Laborers'* were far more serious than the disclosures/omissions attributed to TXU in the instant case.[13]

A case in the Southern District of Texas, *In re Cybertronics Inc. Securities Litigation*, 523 F. Supp.2d 547 (S.D. Tex. 2007), also interpreted the scienter pleading requirements post-*Tellabs* and dismissed a shareholder suit under the PSLRA. In *Cybertronics*, the purchasers of the defendant's stock brought suit, alleging that the "defendants made false and misleading statements" regarding the likelihood that the defendant's medical device would be approved for the treatment of depression, the status of the FDA approval process, and the likelihood of payer approval. *Id.* at 550. Holding that the shareholders did not plead facts giving rise to a strong inference of scienter, the court found that "plausible non-culpable alternative[]" inferences outweighed those in support of scienter. *Id.* at 554.

---

[13]      See also *Zonagen*, 267 F.3d at 424-26 (pre-*Tellabs* case finding a strong inference of scienter where corporate executives affirmatively misrepresented the patent status of the corporation's only product in order to raise the corporation's stock price); *Abrams*, 292 F.3d at 431-32 (pre-*Tellabs* case refusing to find a strong inference of scienter where company executives affirmatively represented that the corporation had no internal accounting issues the day after two financial officers quit even though it was later revealed that there were significant accounting irregularities at the time -- the court noted the lack of internal or external documents revealing scienter); *R2 Investments*, 401 F.3d at 644 (pre-*Tellabs* case refusing to find a strong inference of scienter where the defendants made affirmative misrepresentations regarding the corporation's cash-on-hand situation even though the plaintiffs alleged that specific officials knew that material information was omitted from public disclosures).

Once again, taking all well-pleaded facts and evaluating them holistically, the court does not find a strong inference of scienter attributable to the defendants. On balance, when compared to the other post-*Tellabs* decisions, the facts set forth by the plaintiffs do not demonstrate the sort of fraudulent intent the PSLRA aims to enforce. *Tellabs,* 127 S.Ct. at 2504 (recognizing the "strict[] demand Congress sought to convey in § 21D(b)(2)."). Therefore, counts one, two, and three of the second amended complaint must be dismissed.

### 3. *Common Law Fraud - Count Four*

The plaintiffs have also alleged, as an alternative to their PSLRA claims, a claim for common law fraud.[14] In a second motion to dismiss, filed forty-five days after the initial motion to dismiss, TXU moves to dismiss the common law fraud claims under Rule 12(b)(6). *See generally* Second Motion to Dismiss. In response, the plaintiffs argue that the common law fraud claim is sufficient. In addition, the plaintiffs oppose the motion to dismiss count four on procedural grounds, moving to strike TXU's motion as untimely pursuant to Rule 12(g)(2) of the Federal Rules of Civil Procedure. *See* Plaintiff's Motion to Strike ¶ 5.

In the defendants' initial motion to dismiss under the PSLRA, there was no mention of dismissing count four of the second amended complaint. The defendants

---

[14]     Under the Securities Litigation Uniform Standards Act ("SLUSA"), 15 U.S.C. § 78bb(f)(1), claims for common law fraud may not be brought in a class action suit. Consequently, the common law fraud claim may only be asserted on behalf of the named plaintiffs.

note, however, that the plaintiffs' original complaint, before the *Tellabs* decision, made no mention of common law fraud. Defendants' Response to Plaintiffs' Motion to Strike at 3-4. The court finds that the plaintiffs will not be prejudiced by consideration of the second motion to dismiss; addressing the issue now only serves judicial economy -- the issue has been briefed and is ripe for determination. Therefore, the plaintiffs' amended motion to strike the defendants' second motion to dismiss count four is denied.

Pleading fraud with particularity requires that a plaintiff specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent. *Williams*, 112 F.3d at 177.

In response to the defendants' motion to dismiss, the plaintiffs argue that because common law fraud claims are not subject to the PSLRA scienter requirements, it necessarily follows that they have adequately alleged a cause of action for fraud. *See* Plaintiffs' Opposition to Defendants' Motion to Dismiss Count Four of Plaintiffs' Amended Complaint (Common-Law Fraud) or for Judgment on the Pleadings at 3. Regarding TXU's alleged misrepresentations, the plaintiffs make the conclusory statement that they have explained "precisely when they were made, by whom made, why they were material, why they were misleading, and what the Defendants obtained by making them." *Id.* at 4. However, as discussed above,

simply because the plaintiffs were misled, the court does not therefore find TXU's statements to be misleading; the plaintiffs fail to show *how* each statement was fraudulent. *Melder v. Morris*, 27 F.3d 1097, 1100 (5th Cir. 1994). Accordingly, the court is compelled to dismiss the plaintiffs' common law fraud claim.

## III. CONCLUSION

For the reasons stated above, the defendants' motions to dismiss are **GRANTED**, the defendants' motion to strike the report of Linda Allen is **DENIED** as moot, the plaintiffs' motion to strike the defendants' second motion to dismiss is **DENIED**, and the plaintiffs' motion for a hearing is **DENIED**. The plaintiffs' second amended class action complaint is **DISMISSED** with prejudice for failure to state a claim on which relief can be granted.

**SO ORDERED**.

April 4, 2008.

A. JOE FISH
**Senior United States District Judge**